# Exhibit A

1    SUMM
2    ROBERT T. EGLET, ESQ.
     Nevada Bar No. 3402
3    ROBERT M. ADAMS, ESQ.
     Nevada Bar No. 6551
4    ARTEMUS W. HAM, ESQ.
     Nevada Bar No. 7001
5    ERICA D. ENTSMINGER, ESQ.
     Nevada Bar No. 7432
6    CASSANDRA S.M. CUMMINGS, ESQ.
     Nevada Bar No. 11944
7    **EGLET ADAMS EGLET**
     **HAM HENRIOD**
8    400 S. Seventh St., Suite 400
     Las Vegas, NV 89101
9    Ph: (702) 450-5400; Fax: (702) 450-5451
     Email: eservice@egletlaw.com
10   *Attorneys for Plaintiffs*

11

12                           **DISTRICT COURT**

13                      **CLARK COUNTY, NEVADA**

14

15   DIANE ESPOSITO HOWARD, as Special        CASE NO.: A-24-889099-C
     Administrator of the Estate of AVIANNA   DEPT. NO. 9
16   CAVANAUGH, Deceased; and THERESA
     DIANE KEYES, Individually and Heir of the
17   Estate of AVIANNA CAVANAUGH,

18
             Plaintiffs,
19
                                                        **SUMMONS**
20   vs.

21   SNAP, INC.; DOES 1 through 20 and ROE
     CORPORATIONS 1 through 20, inclusive,
22

23           Defendant.

24

25

26

27

28

## SUMMONS

**NOTICE! YOU HAVE BEEN SUED. THE COURT MAY DECIDE AGAINST YOU WITHOUT YOUR BEING HEARD UNLESS YOU RESPOND WITHIN 21 DAYS. READ THE INFORMATION BELOW.**

**TO THE DEFENDANTS:** A Civil Complaint has been filed by the plaintiff(s) against you for the relief set forth in the Complaint.

## SNAP, INC.

1.      If you intend to defend this lawsuit, within 21 days after this Summons is served on you exclusive of the date of service, you must do the following:

       a.      File with the Clerk of this Court, whose address is shown below, a formal written response to the Complaint in accordance with the rules of the Court.

       b.      Serve a copy of your response upon the attorney whose name and address is shown below.

2.      Unless you respond, your default will be entered upon application of the plaintiff(s) and this Court may enter a judgment against you for the relief demanded in the Complaint, which could result in the taking of money or property or other relief requested in the Complaint.

3.      If you intend to seek the advice of an attorney in this matter, you should do so promptly so that your response may be filed on time.

. . .

. . .

. . .

. . .

2

4.     The State of Nevada, its political subdivisions, agencies, officers, employees, board members, commission members and legislators, each have 45 days after service of this Summons within which to file an Answer or other responsive pleading to the Complaint.

Submitted by:

ROBERT T. EGLET, ESQ.
Nevada Bar No. 3402
ROBERT M. ADAMS, ESQ.
Nevada Bar No. 6551
ARTEMUS W. HAM, ESQ.
Nevada Bar No. 7001
ERICA D. ENTSMINGER, ESQ.
Nevada Bar No. 7432
CASSANDRA S.M. CUMMINGS, ESQ.
Nevada Bar No. 11944
**EGLET ADAMS EGLET**
**HAM HENRIOD**
400 S. Seventh St., Suite 400
Las Vegas, NV  89101
Ph: (702) 450-5400; Fax: (702) 450-5451
Email: cservice@egletlaw.com
*Attorneys for Plaintiffs*

Steven D. Grierson, Clerk of the Court

*Marianne Mallet*     7/5/2024

DEPUTY CLERK          Date
Regional Justice Center
200 Lewis Avenue
Las Vegas, NV 89155
Marane Mallet

3

**AFFIDAVIT OF SERVICE**

STATE OF NEVADA    )
                   ) ss
COUNTY OF CLARK    )

1  _____, being duly sworn says:  That at all times herein Affiant was and is a citizen of the United States, over 18 years of age, not a party or interested in the proceeding in which this affidavit is made. That Affiant received copies of the Summons and Complaint on the _____ day of _____, 20__, and served the same on the _____ day of _____, 20__, by:

    1. Delivering and leaving a copy with the defendant _____, at _____;

or

    2. Serving the defendant _____, by personally delivering and leaving a copy with _____, a person of suitable age and discretion residing at the defendant's usual place of abode located at _____.

or

    3. Serving the defendant _____, by personally delivering and leaving a copy at _____.

        a.  with _____ as _____, as agent lawfully designated by statute to accept service of process;

        b.  with _____, pursuant to NRS 14.020 as a person of suitable age and discretion at the above address, which address is the address of the resident agent as shown on the current certificate of designation filed with the Secretary of State.

or

    4. Personally depositing a copy in a mail box of the United States Post Office, enclosed in a sealed envelope postage prepaid for _____ ordinary mail; _____ certified mail, return receipt requested; _____ registered mail, return receipt requested; and addressed to the defendant _____, at the defendant's last known address which is _____.


_____
AFFIANT

SUBSCRIBED AND SWORN to before
Me this _____ day of _____, 20__.


_____
NOTARY PUBLIC in and for the County
and State aforesaid.

4

Electronically Filed
3/13/2024 10:55 PM
Steven D. Grierson
CLERK OF THE COURT

COMJD
ROBERT T. EGLET, ESQ.
Nevada Bar No. 3402
ROBERT M. ADAMS, ESQ.
Nevada Bar No. 6551
ARTEMUS W. HAM, ESQ.
Nevada Bar No. 7001
ERICA D. ENTSMINGER, ESQ.
Nevada Bar No. 7432
CASSANDRA S.M. CUMMINGS, ESQ.
Nevada Bar No. 11944
**EGLET ADAMS EGLET HAM HENRIOD**
400 S. Seventh St., Suite 400
Las Vegas, NV 89101
Ph: (702) 450-5400; Fax: (702) 450-5451
Email: eservice@egletlaw.com
*Attorneys for Plaintiffs*

CASE NO. A-24-889099-C
Department 9

**DISTRICT COURT**

**CLARK COUNTY, NEVADA**

DIANE ESPOSITO HOWARD, as Special Administrator of the Estate of AVIANNA CAVANAUGH, Deceased; and THERESA DIANE KEYES, Individually and Heir of the Estate of AVIANNA CAVANAUGH,

Plaintiffs,

vs.

SNAP, INC.; DOES 1 through 20 and ROE CORPORATIONS 1 through 20, inclusive,

Defendant.

CASE NO.
DEPT. NO.

**COMPLAINT AND DEMAND FOR JURY TRIAL**

**EXEMPTION FROM ARBITRATION REQUESTED: Wrongful Death Damages Exceed $50,000.00**

Plaintiffs, DIANE ESPOSITO HOWARD, as Special Administrator of the Estate of AVIANNA CAVANAUGH, Deceased and THERESA DIANE KEYES, Individually and Heir of the Estate of AVIANNA CAVANAUGH, by and through their undersigned attorneys, brings this Complaint for wrongful death (NRS 41.085), negligence, strict product liability, breach of warranty, and misrepresentation, for injuries caused as a result of Decedent AVIANNA CAVANAUGH'S use of Snap, Inc.'s social media product, Snapchat, and allege, upon information and belief, as follows:

## I.    INTRODUCTION

1.    On January 31, 2024, the United States Senate Judiciary Committee held a hearing on the dangers of social media. During the hearing, Senate Judiciary Committee Ranking Member, Senator Lindsey Graham, remarked: "Social media companies, as they're currently designed and operate, are dangerous products. They're destroying lives, threatening democracy itself. These companies must be reined in, or the worst is yet to come."

2.    Snapchat is a social media product which allows its users to create and share images and messages called "snaps" that are automatically erased after viewing.

3.    This Complaint arises out of the defective design and negligent operation of the dangerous social media product Snapchat. All allegations in this complaint are directed exclusively at Snapchat's design and operation.

4.    This Complaint does not allege that Snap needed to review, edit, or withdraw any third-party content to meet its obligations to design and operate its product in a reasonably safe manner.

5.    Defendant Snap, Inc. ("Snap") expressly designed and operated Snapchat as a tool to facilitate nefarious and illicit activity. Snapchat was conceived as a product which would instantaneously delete evidence of activity performed on the platform, not only on the users' end, but also from Snap's internal servers.

6.    It has been reported that the Snapchat was conceived by its co-founder, Reggie Brown, who "when he was smoking marijuana with his Stanford University fraternity brothers…mused that a disappearing-images app would make sexting with girls easier." Brown presented this concept to his friend, fraternity brother, and now CEO of Snap, Evan Spiegel, who promptly deemed the concept a "million-dollar idea."[1]

7.    Spigel's assessment that an app designed specifically for sexting would be a million-dollar product turned out to be a significant underestimation. Today, Snap is valued at more than Twenty-Eight Billion Dollars. In 2015, Spiegel became the youngest billionaire in the world, and as of March 2023, his personal net worth was reported to be $2.7 Billion.

---

[1] Theo Wayt, *Fall of Reggie Brown, the techie who made your pictures vanish in a 'Snap'*, N.Y. Post, Nov. 3, 2022.

2

8.      Snapchat owes its success, in large part, to the children and young adults who use its products.

9.      Snapchat is designed and operated in a manner which encourages frequent, extensive, and habitual use, particularly by users with developing minds such as children, teens, and young adults.

10.     It has been reported that Snapchat is the most popular social media platform among teenagers, and that 65% of internet users aged 15 to 29 use Snapchat.[2]

11.     According to Snap CEO Evan Spiegel, as of January 31, 2024, 20 million teenagers were actively using Snapchat in the United States.

12.     Snap deliberately targets children and young adults as potential consumers of its products, including Snapchat.

13.     According to Snap's Terms of Service, Snap's products are directed toward children as young as 13 years old.

14.     Given the number of children that Snap acknowledges as users, it is unsurprising that, publicly, Snapchat has pivoted from promoting itself as a sexting app and has instead styled itself as a harmless product which mimics real-world communication.

15.     Snap fails to provide adequate warning to users and parents about the inherent risks of using Snapchat, and Snap purports that Snapchat is safe and appropriate for all users, including children.

16.     Snap also proports that all Snapchat users, including children aged 13 and above, "can expect that [Snap] will take action against any activity that undermines public safety…" and can expect Snap to act against the "selling or facilitating sales or illegal or regulated drugs…"[3]

---

[2] Salman Aslam, *Snapchat by the Numbers: Stats, Demographics & Fun Facts* (Jan. 10, 2024), at https://www.omnicoreagency.com/snapchat-statistics/
[3] Snap, Inc. online Privacy and Safety Hub, *Illegal or Regulated Activities: Community Guidelines Explainer Series*, at https://values.snap.com/privacy/transparency/community-guidelines/illegal-or-regulated-activities (updated: Jan. 2024).

3

17.    Snap has not only failed to take reasonable measures to keep young people safe on its platform, but has operated its platform in a manner which contributes to the illicit and harmful targeting of minors by drug dealers.

18.    Snap proports that its "Family Center" supervision controls allow parents to monitor and supervise the online activity of their children.

19.    However, although tens of millions of children and young adults use Snapchat, the Family Center parental control features were not released until 2022, approximately eleven years after Snapchat was first released.

20.    Further, the Family Center tools are ineffective and/or underutilized because they are inadequately promoted and ineffectively implemented by Snap. On January 31, 2024, Evan Spiegel testified that parental control tools were only utilized by 1% of Snapchat's 20 million teenaged users.

21.    As a result of Snapchat's product features, Snap's inadequate and ineffective safety measures, and Snap's operational decisions as described in detail below, Snapchat encourages unscrupulous adults to target minors and young adults for harmful and illicit activity, including illicit drug sales.

22.    As a result, Snapchat has positioned itself as the social media platform of choice for drug dealers, to the detriment of its young users.

23.    Snapchat's product features are so favored by drug dealers that it has become associated with more fentanyl overdose deaths of children and young adults than any other social media product in the United States.

24.    The defective design and ongoing negligent operation of the dangerous social media product Snapchat has resulted in foreseeable injury and death to numerous Snapchat users, including Decedent Avianna Cavanaugh ("Avi").

25.    Snap was on notice that Snapchat's features were being used to facilitate the sale of illicit counterfeit prescription drugs, resulting in the death of numerous Snapchat users, long before Avi's death.

4

## II.    PARTIES

26.    Plaintiff DIANE ESPOSITO HOWARD ("Diane") is, and at all times herein relevant was, a resident of the County of Clark, State of Nevada, and brings this action as the special administrator of the Estate of Avianna Cavanaugh. Diane maintains this action in a representative capacity, for the benefit of Avi's estate.

27.    Plaintiff THERESA DIANE KEYES is the natural mother and heir of Decedent Avianna Cavanaugh.

28.    Defendant, Snap Inc., is and was a Delaware corporation with its principal place of business in Santa Monica, CA which, at all times relevant hereto, was authorized to do and was doing business in the County of Clark, State of Nevada.

29.    Plaintiffs are informed and believe, and thereon allege, that at all times mentioned herein, Defendant Snap Inc. was acting by and through its agents, servants, employees, partners, and/or joint venturers who, in doing the acts herein alleged, were acting within the course and scope of said agency, employment, partnership, or joint venture. Defendant aforesaid was acting as a principal and was negligent or grossly negligent in the selection, retention, hiring, and training, and/or ratified the conduct of every agent, servant, employee, or joint venturer.

30.    That the true names and capacities, whether individual, corporate, association or otherwise of the Defendants, DOES 1 through 20 and/or ROE CORPORATIONS 1 through 20, inclusive, are unknown to Plaintiffs, who therefore sue said Defendants by such fictitious names. Plaintiffs are informed and believe, and thereupon allege, that each of the Defendants designated herein as DOES and/or ROES is responsible in some manner for the events and happenings herein referred to, and in some manner caused the injuries and damages proximately thereby to Decedent Avianna Cavanaugh and to Plaintiffs, as herein alleged; that Plaintiffs will ask leave of this Court to amend this Complaint to insert the true names and capacities of said Defendants, DOES 1 through 20 and/or ROE CORPORATIONS 1 through 20, inclusive, when the same have been ascertained by Plaintiffs, together with the appropriate charging allegations, and to join such Defendants in this action.

5

1     31.     That Plaintiffs are informed and believe, and based upon such information and

2  belief, allege that each of the Defendants herein designated as DOES and ROES are in some

3  manner, responsible for the occurrences and injuries sustained and alleged herein, and are any

4  one of the following:

5           a.   Parties responsible in some manner for the events and happenings herein referred

6                to that caused fatal injuries to Avianna Cavanaugh and damages proximately

7                thereby to the Plaintiffs as herein alleged;

8           b.   Parties that are the agents, servants, employees, partners, and/or joint venturers,

9                and/or contractors of SNAP INC., each of them acting within the course and

10              scope of their agency, employment or contract, and with the knowledge and

11              consent of SNAP INC.

12     32.     That Plaintiffs are informed and believe and thereon allege that at all relevant times

13  herein mentioned, that Defendants, and each of them, were the agents and/or servants and/or

14  employees and/or partners and/or joint venture partners and/or employers of the remaining

15  Defendants and were acting within the course and scope of such agency, employment, partnership

16  or joint venture and with the knowledge and consent of the remaining Defendants.

17                    **III. JURISDICTION**

18     33.     Plaintiffs repeat and re-allege the allegations of the preceding paragraphs of the

19  Complaint as though fully set forth herein and incorporate the same herein by reference.

20     34.     All facts and circumstances that give rise to the subject lawsuit occurred in Clark

21  County, Nevada.

22     35.     Plaintiffs did not enter into a User Agreement or other contractual relationship

23  with Snap in connection with Avianna Cavanaugh's use of Snapchat. Plaintiffs alleges that if any

24  such agreement arose, it is void under applicable law as unconscionable and/or against public

25  policy. Plaintiffs additional disaffirms any "agreements" into which Avianna Cavanaugh, may

26  have entered with Snap concerning Avianna's use of Snapchat, and such disaffirmation occurred

27  prior to Avianna reaching the  applicable age of majority in Nevada or within a reasonable time

28

EGLET ADAMS
EGLET HAM HENRIOD

6

1 | thereafter under the facts and circumstances of this case. As such, Plaintiffs are not bound by any

2 | arbitration, forum selection, or choice of law provision set forth in any such "agreement.'"

3 |      36.    The Eighth Judicial District Court, Clark County, Nevada has jurisdiction over this

4 | civil tort action in accordance with NRCP 8(a)(4), NRS § 13.040, and NRS § 41.130, as the

5 | occurrence giving rise to this matter occurred in Clark County, Nevada, and the amount in

6 | controversy exceeds Fifteen Thousand Dollars ($15,000.00).

7 | **IV.  FACTUAL ALLEGATIONS**

8 |      37.    Plaintiffs plead this cause of action with the specificity required by Rule 9(b) to

9 | provide Defendants with adequate notice "about the nature of the charges so that [Defendants]

10 | may defend the claims without merely asserting a general denial." *Rocker v. KPMG LLP*, 122

11 | Nev. 1185, 1192, 148 P.3d 703, 707-708 (2006). Plaintiffs' allegations assert the facts available

12 | to Plaintiffs at the time of preparation of this Complaint. Additional facts and information to

13 | support this cause of action are solely in Defendants' possession, are not available to Plaintiffs,

14 | and will not be available to Plaintiffs until they are able to conduct discovery. *See id.* Plaintiffs

15 | will bolster and enhance their allegations following discovery.

16 |     **A.    Snap and Fentanyl Poisoning: Snapchat's Unique Features Facilitate Sales of**

17 | **Illegal and Deadly Counterfeit Drugs.**

18 |      38.    Fentanyl is a potent synthetic opioid analgesic, significantly more potent than

19 | morphine or heroin. Illicitly manufactured fentanyl has flooded the black market in Nevada and

20 | across the United States.

21 |      39.    Although Snapchat's features have been utilized for a variety of illicit and harmful

22 | activity, in recent years, the sale of illegal counterfeit drugs, laced with fentanyl, has been one of

23 | the deadliest uses of the product.

24 |      40.    In a Public Safety Alert issued on September 27, 2021, the U.S. Drug Enforcement

25 | Administration underscored the escalating threat of counterfeit prescription pills containing

26 | fentanyl and methamphetamine. The DEA reported that these counterfeit pills, which masquerade

27 | as prescription opioids like oxycodone (Oxycontin®, Percocet®), hydrocodone (Vicodin®), and

28 | alprazolam (Xanax®), as well as stimulants such as amphetamines (Adderall®), have been seized

7

1 | by the DEA in record quantities. The DEA also detailed that these pills often contain lethal doses
2 | of fentanyl.

3 |     41.    According to the Public Safety Alert, there was a 430 percent surge in the number
4 | of seized counterfeit pills containing at least two milligrams of fentanyl between 2019 and 2021.
5 | Laboratory testing indicates that two out of every five fentanyl-containing pills hold potentially
6 | lethal doses.

7 |     42.    According to the Centers for Disease Control and Prevention, deaths of teenagers
8 | and young adults resulting from fentanyl overdose have surged dramatically in recent years,
9 | outpacing fatalities from other causes such as motor vehicle accidents and homicides.

10 |     43.    According to the National Institute on Drug Abuse, deaths caused by synthetic
11 | opioids far outpace those caused by any other substances.

12 |     44.    As a result of its design, features, and operational procedures, Snapchat has
13 | become the preferred product for use by drug dealers and is associated with more fentanyl deaths
14 | of children and young adults than any other social media product in the United States.

15 |     45.    Snapchat's popularity with illegal drug dealers is not a coincidence; it is the result
16 | of Snapchat's design and Snap's operating procedures. Although Snapchat is no longer promoted
17 | as a tool for exchanging sexually explicit photographs, Snap has retained and/or bolstered
18 | Snapchat's core product features which are designed and intended to facilitate nefarious conduct.
19 | Those core features include, but are not limited to: (1) automatic deletion of all content posted on
20 | the platform; (2) notification to users when other users on the platform attempt to retain evidence
21 | of their posts; (3) Snap's retention procedures which result in the loss of user information from
22 | its servers; (4) Snap's inadequate age-verification systems and procedures; and, (5) Snaps'
23 | inadequate account verification systems and procedures which allow individuals to create
24 | multiple accounts with a single email address and phone number.

25 |     46.    At all times relevant to this Complaint, Snap knew, or should have known, that its
26 | product features were uniquely suited to enabling illegal activity on Snapchat, including the sale
27 | of counterfeit fentanyl-laced drugs. Snapchat's uniquely dangerous features have been repeatedly
28 | brought to its attention. Numerous watchdog groups and media outlets have identified Snapchat

EGLET ADAMS
EGLET HAM HENRIOD

8

1  as the social media product of choice for use by drug dealers and have pointed to Snapchat's
2  unique product features as the cause of its popularity among dealers.

3      47.     According to The Partnership for Safe Medicines, a nonprofit public health group,
4  Snapchat has been linked to the sale of fentanyl-laced counterfeit pills that have caused the deaths
5  of teenagers and young adults in at least 15 states. A subsequent investigation by NBC News
6  identified Snapchat related deaths in additional states.

7      48.     In October of 2023, the Executive Director of the National Crime Prevention
8  Council, Paul DelPonte, sent a letter to the Attorney General's office urging the Department of
9  Justice and the Biden Administration to investigate Snapchat and other social media products for
10 their role in the proliferation of illegal fentanyl. Mr. DelPonte identified Snap, Inc., as a product
11 of "particular concern." "Snapchat has become a digital open-air drug market allowing drug
12 dealers to market and to sell fake pills to unsuspecting tweens and teens… The platform gives
13 drug dealers the ability to hide behind encrypted technology and posts that disappear from public
14 view within 24 hours or less. This is not a protection of free speech. It is the aiding and abetting
15 of the worst kinds of criminal acts."

16     49.     According to an investigation by the New York Times, there has been a record
17 number of fentanyl overdose deaths in the United States, with Snapchat identified as "the platform
18 that gets used the most [by dealers of illegal counterfeit drugs] as it provides anonymity,
19 disappearing content, and doesn't allow third-party monitoring."[4] Avi was killed by a counterfeit
20 fentanyl-laced pill sold through Snapchat.

21     50.     Upon information and belief, Snap, through its executives and board members, has
22 known for years that Snapchat's differentiating product features render it an ideal distribution
23 channel for illegal and dangerous drugs.

24     51.     Snap was on notice that its product was designed with effective tools to allow drug
25 dealers to contact and sell drugs to young adults like Avi.

26

27

28 [4] Sarah Maslin Nir, *Inside Fentanyl's Mounting Death Toll: 'This is Poison'*, N.Y. Times, Nov. 20, 2021, available at https://www.nytimes.com/2021/11/20/nyregion/fentanyl-opioid-deaths.html

9

52.     Snap was given multiple specific warnings, prior to Avi's death, that additional children would die from fentanyl overdose if Snap did not take reasonable action to make Snapchat safer and/or to warn users of the dangers associated with the product.

53.     Despite knowing that its product is dangers and has resulted in harm to numerous young users, Snap, at all times relevant to this Complaint, failed to take reasonable measures to ensure that Snapchat was safe for use.

**B.      Snap    Facilitates    Counterfeit    Fentanyl    Sales    through    Snapchat's "Disappearing" Messages Feature and Data Deletion Procedures.**

54.     To meet Snapchat's design objective of encouraging and protecting indecent and/or illicit interactions between users, Snapchat was developed to destroy all evidence of user interaction, not only from users' devices, but also from Snap's internal servers.

55.     Snapchat's "disappearing" data feature, combined with Snap's data destruction procedures, emboldens drug dealers to use Snapchat for promoting and selling illegal and deadly drugs with the belief that their actions will be shielded from law enforcement.

56.     Snap also designed and implemented additional features which embolden drug dealers to use Snapchat for their illicit gains. For example, Snapchat is designed to notify users when anyone attempts to capture a screenshot of a "Snap" they have sent. When an attempted screen capture occurs, the sender of the "Snap" is immediately notified.

57.     Snapchat is also designed to entirely prevent screen captures of Snaps received on certain web browsers.

58.     The anti-screen capture features of Snapchat allow nefarious users to take evasive action when the product notifies them that another user has attempted to retain evidence of their activity. The user can delete the contact and/or block the individual who attempted to retain the screenshot, or the user can take more severe measures by threatening the individual.

59.     Nefarious users can also delete their own accounts when they suspect that they are being monitored. They can then simply open a new account to continue their activities by using the same device, phone number, and email address used to create the prior account.

1   60.    These features operate to discourage recipients of harmful Snaps from
2   documenting or reporting illicit activity occurring on Snapchat, and function, as intended by Snap,
3   to facilitate and encourage users to engage in illicit, harmful, and/or dangerous activity.

4   61.    Snapchat's "disappearing" data feature, combined with Snap's data destruction
5   procedures, also function to thwart law enforcement efforts by destroying relevant evidence of
6   illegal activity before law enforcement can request the evidence through appropriate channels.

7   62.    These product features lure users into a world where all evidence of user activity
8   disappears like magic. The features do not function like traditional privacy tools, routinely
9   employed by other tech companies, which safely retain and safeguard customer data. Instead,
10  Snap's features and procedures concerning user data are designed to allow users to operate with
11  impunity under the belief that they will be able to avoid all oversight. Snap's design choices serve
12  as a cover for harmful user activity, allowing Snap's customers to use Snapchat for whatever
13  means they desire, without the constraints of accountability or supervision.

14  **C.    Snap Facilitates Connections with Drug Dealers and Other Predatory Adults**
15  **through Snapchat's Recommended Content and "Quick Add" Features.**

16  63.    Snapchat users must first be connected as "friends" within the program before they
17  can exchange Snaps with each other.

18  64.    To increase user engagement, Snap designed Snapchat to encourage users to
19  continually expand their Snapchat "friend" group.

20  65.    For example, Snap has implemented social metric tools which encourage users to
21  add more and more "friends" by exploiting their need for social validation. Snap developed "Snap
22  Score" to quantify and display a user's popularity on Snapchat. By making Snap Scores known
23  to users and their contacts, Snap encourages users to grow their popularity by adding more and
24  more "friends."

25  66.    Snap also designed and implemented Snapchat's "Quick Add" feature, which
26  generates lists of recommended "friends" for users to quickly add to their accounts.

27
28

11

67. Although users have the option to deny Snapchat's connection recommendations, they are encouraged to accept recommended connections through Snapchat's features which reward users for continually growing their Snapchat network.

68. Under certain circumstances, Quick Add creates recommended connections between (1) users with mutual friends on Snapchat; and (2) users whose contact information is already saved in their phone contact list.

69. Snapchat's quick recommendations of "friends of friends" can include people who do not know each other in real life, did not seek to connect with one another, and who would never have met if not for Snapchat.

70. Upon information and belief, Snapchat's "quick add" feature also functions, in certain circumstances, to suggest connections between strangers based on their locations, mutual interests, similarities between their accounts, and other factors developed but not disclosed by Snap.

71. Snapchat's Quick Add feature functions to connect strangers to each other on the platform, including connecting children and young adults with predatory adults and drug dealers.

72. Quick Add can be used by drug dealers to expand their potential client contacts. A drug dealer only needs to connect with one user who is popular on Snapchat before the program begins suggesting the dealer's account to other users.

73. "Snap designed its product to actively identify and connect strangers, including children, in ways that would increase their engagement with Snapchat despite the very real harms that were resulting."

**D.    Snapchat's Geolocation, Targeted Messaging, and Content Promotion Features Further Facilitate and Encourage Illegal Drug Sales on the Platform.**

74. Snap developed and implemented the "Stories" feature of Snapchat, which allows users to broadcast a series of snaps to multiple users. Stories remain viewable for a preset amount of time (twenty-four hours by default) before they are automatically deleted.

12

75.     Snap developed geo-location features which it implemented into Snapchat to allow users to share posts based on their geographic location. This tool allows drug dealers to link the drugs they are selling to a specific location visible to other users searching in that area.

76.     Using Snapchat's geolocation and Stories features, drug dealers are able to broadcast that they have drugs available for sale at a specific location, knowing that these advertisements will disappear after they have completed their drug sales.

77.     Other Snapchat features can expose users to accounts which promote drug use even where users do not request these connections and information.

78.     For example, Snapchat analyzes user's search data for the purpose of recommending and suggesting advertisements and user connections. Thus, if a curious teen or young adult enters a drug-related search in Snapchat, Snap leverages that search data to boost interaction and engagement by matching the searching user to others, including potential drug dealers on the platform.

79.     Snap could make design and operational changes to Snapchat to make it safer for use by young adults and less attractive to drug dealers. These product design changes could be made without reviewing or editing any third-party content posted to its platform. Instead of making these changes, and despite actual knowledge of the harm caused by the product design, Snap continues to distribute its dangerous product to young users.

**E.     Snap's Operational Policies and Procedures Encourage and Facilitate Drug Dealing.**

80.     Despite actual knowledge that its product's features could and were being used to facilitate illegal drug sales, Snap failed to implement or enforce reasonable policies to prevent illicit drug transactions and other harms occurring as a result of Snapchat's features.

81.     For example, Snap has failed to implement an effective user identification system which could function to prohibit predatory users from using Snapchat's tools for illicit gain. Snap could block user access based on the device they use to connect to Snapchat and could use other user data to prevent predatory users from opening new accounts. Instead of implementing these procedures, Snap employed a defectively designed system, which allows users who have been

13

1  previously removed from the platform for predatory behavior to simply activate alternate
2  accounts.

3      82.    Snap has also failed to implement procedures to verify the phone number and
4  email address used to create accounts. These procedures could reduce or prevent bad actors from
5  creating secondary accounts to get around account suspension or law enforcement suspicion.

6      83.    Upon information and belief, Snap has also failed to implement reasonable
7  procedures to preserve account data and act upon reports of drug dealers operating openly on
8  Snapchat.

9      84.    These operational failures allow known drug dealers to continue operating freely
10  on Snapchat, exposing additional users to unreasonable risk, despite Snap's policies and
11  assurances to users that they would be protected from these individuals while using Snapchat.

12     **F.    Snap Targets and Distributes its Product to Young and Impressionable**
13  **People.**

14     85.    According to Snap's Terms of Service, Snap's products are directed toward
15  children as young as 13 years old.

16     86.    65% of internet users aged 15 to 29 are Snapchat users. As of January 2024, 20
17  million teenagers were actively using Snapchat within the United States.

18     87.    To increase user engagement and screentime, Snap has designed Snapchat in a
19  manner that is deliberately habit forming, particularly to younger users with still developing
20  brains.

21     88.    Snap has a financial incentive to design products which encourage prolonged use
22  and engagement. Snap's enormous profits are largely due to sales of target advertisements
23  directed to its young users.

24     89.    Snap knows that its product features can place Snapchat's young users in peril, but
25  continues to market its product as suitable and appropriate for use by children and young adults.

26     90.    Snap claims that Snapchat is not distributed to children under age thirteen;
27  however, because of Snap's ineffective age verification and parental consent policies, Snapchat's
28  purported age use restrictions are essentially fiction.

14

1    91.    Snapchat's age verification procedure asks users to self-report their dates of birth.

2    The system allows users multiple attempts at entering an acceptable age range, and creates

3    accounts for users who previously entered information indicating that they were too young to

4    open an account.

5    92.    As a result, Snap routinely distributes Snapchat for use to users who are under

6    eighteen without parental consent.

7    93.    For example, Avi's mother, like countless other parents of young Snapchat users,

8    was not asked for consent before Snapchat provided an account to Avi. As a result, Avi's mother

9    does not know precisely when she began using the product. Nevertheless, upon information and

10    belief, Avi first started using Snapchat, without parental consent, while she was under eighteen

11    years old.

12    **G.    Avianna Cavanaugh was Killed as a Result of Snapchat's Defective Design**

13    **and Negligent Operation.**

14    94.    Avianna Cavanaugh was born on October 11, 2000, in Las Vegas, Nevada, where

15    she grew up.

16    95.    Avi got her first cell phone when she was either 13 or 14 years old. The phone was

17    supposed to keep Avi safe. Her mom wanted Avi to have a line of communication when walking

18    to school or riding the bus. Avi's mom felt better knowing that Avi could call family, or dial 911,

19    if there was ever an emergency. At first, Avi only used the phone to communicate with family.

20    96.    Avi was introduced to social media at age 14. She used Facebook and YouTube

21    as social and educational tools. At age 14, Avi used YouTube videos to teach herself how to play

22    piano.

23    97.    Avi's mother was always cautious with Avi's social media use. She did not let Avi

24    have her phone powered on after 10:00 P.M., and she was not allowed to keep her phone in her

25    bedroom at night. Her mother also made sure that Avi added her as a friend to all of Avi's social

26    media accounts (of which she was aware), so that she could monitor activity and see the posts

27    that were being shared with Avi. Despite these efforts, Avi began using Snapchat without her

28    mother's knowledge or consent.

15

98.    Avi's mother is not certain when Avianna's Snapchat use began. Although Snap claims that it requires parental consent for minors to establish accounts, in fact, parental consent is not required. Upon information and belief, Snap provided Avi with a Snapchat account when she was under 18 years of age, without her parents' knowledge or consent.

99.    Avi's mother first learned that Avi was using Snapchat when she was 16 or 17 years old. At that time, Avi's mother did not know what Snapchat was. Although she asked Avi about Snapchat, Avi's mother was never warned of its potential dangers at any time prior to Avi's death.

100.    Avi suffered from various mental health problems at an early age, and her family observed that her mental health issues, including increased anxiety, were exacerbated significantly by her use of social media and Snapchat.

101.    Snap actively concealed the defects and dangers of its product and failed to provide warnings regarding the danger it poses to its users, particularly the danger it poses to users under 18.

102.    Had Avi's mother been warned about Snapchat's dangerous design, or been notified that drug dealers were being promoted and connected to Avi through Snapchat, she would have done everything in her power to keep her daughter from using Snapchat.

103.    Upon information and belief, when Avi began using Snapchat, she received multiple Quick Add requests from Snapchat users she did not know in real life.

104.    Among the strangers to whom Snap connected Avi were nearby Snapchat drug dealers who Avi did not know in real life, and would not have met but for Snapchat's product features and Snap's operational decisions.

105.    On the evening of March 18, 2021, Avi left her mother's house and went to spend the night with her boyfriend. The next day, while she was at work, Avi's mother received a text message from her husband that read: "911." Avi's mother immediately called her husband, but was unable to understand what he was saying because he was emotional and incoherent. Avi's mother could only make out the word "coroner." She fell to her knees at the back of the restaurant where she had been working and remained unable to move or respond to anyone until an employee

16

1  helped her up. Although the coroner's office had attempted to contact Avi's mother, they had

2  been unable to reach her at work. By the time Avi's mother learned of Avi's death, the police and

3  coroner had nearly finished their initial investigations, and Avi's mother was unable to see Avi's

4  body before she was transported by the coroner.

5      106.    Avi had overdosed from fentanyl poisoning while lying in her boyfriend's

6  bedroom. She was 20 years old at the time.

7      107.    The Las Vegas Metropolitan Police Department initiated an investigation into

8  Avi's death and was eventually able to obtain enough information to determine that Avi had been

9  sold counterfeit pills containing fentanyl by Snapchat dealer Chris_crave. Avi had purchased what

10  she believed to have been either Xanax and/or Oxycodone, but which turned out to be 100%

11  fentanyl.

12      108.    Information regarding Snapchat's facilitation of the sale by Chris_crave to Avi

13  was not immediately available. In fact, Avi's mother did not discover that Avianna's death was

14  facilitated by Snapchat until approximately March 15, 2022, over one year after Avi had been

15  poisoned.

16      109.    Upon information and belief, Snap's product features, particularly the disappearing

17  messaging features and marketing of those features, enabled and convinced Chris_crave (aka Chris

18  Gucci, aka Christopher Gonzalez) that he could communicate with Avi without the risk of the

19  evidence of his crime being preserved for law enforcement. Moreover, Snap connected the dealer

20  with Avi.

21      110.    Snap's user profile feature enabled the dealer to advertise that he was selling drugs

22  illegally through Snapchat, and list what he was selling. These features helped him make

23  connections and find new buyers. This information also automatically disappears after a set time.

24  On information and belief, these product features are why the dealer chose to deal on Snapchat,

25  rather than finding buyers in person or through other social media platforms.

26      111.    The feature that causes information sent through Snapchat to disappear also

27  prevents parents and guardians from reviewing messages and information their children receive

28

17

through Snapchat. This feature also prevented Avi's mother from being able to review any messages or information from Chris_crave following Avi's death.

112.    Chris_crave had no known connection to Avi. They did not know each other in real life. The two would never have connected but for Snapchat.

113.    The extent to which Snap was on notice about deaths caused by this dealer prior to Avi's death is unknown; however, it was reported that the dealer known as Chris_crave sold fentanyl pills disguised as prescription drugs both prior to and after Avi's death.  It is likely, based on what Plaintiffs knows about the Snapchat product, that Snap knew or should have known that this user was distributing drugs on its platform prior to Avi's death.

114.    Since Avi's death, her mother and family members have joined various support groups for families who have lost children to fentanyl poisoning. They have heard dozens of stories of teenagers and young adults who were connected to drug dealers through Snapchat.

115.    Snapchat's defective design and failure to warn were substantial factors in causing Avi's death.

## V.    LEGAL CAUSES OF ACTION

### FIRST CAUSE OF ACTION

#### Strict Products Liability - Dangerously Defective Product

116.    Plaintiffs repeat and reallege each and every allegation set forth in this Complaint, as though the same were fully set forth herein.

117.    That at all times mentioned herein, Defendant Snap was engaged in the business of selling, manufacturing, designing, distributing, warranting, and advertising social media products, including but not limited to, Snapchat.

118.    Snapchat was designed, produced, marketed, and placed into commerce by Snap.

119.    Snapchat is distributed through online retailers as a uniform product.

120.    Snap designed Snapchat with tangible and intangible features that are uniformly advertised and distributed to consumers for use and interaction. Thus, Snapchat is a product for the purposes of product liability law. Snap provides services, features, and functionalities which constitute a social media and technology product. Users engage with Snapchat through its

18

interface, utilize its features, and rely on its performance. Snapchat assumes all characteristics of a product within the context of product liability law and is therefore subject to the same standards of quality and safety.

121.    Snapchat was defectively designed by Snap to delete data and evidence of user activity specifically to provide users with a means to engage in illicit and/or illegal conduct; to attract and addict younger users in order to increase user engagement for profit; and to connect young and unassuming users to adults and predatory users through a variety of product features.

122.    Snapchat was provided to Avi in its original format for delivery, without any warnings with regard to the dangerous design or operational features, including: the product's addictive and habit forming nature; the affirmative recommendation and paring of minor to adults, including drug dealers; the permanent destruction of evidence; and the lack of ineffective design of safety features such as parental monitoring or reporting features.

123.    Avi used Snapchat as intended. Snap knew, or should have known, that Avi would use Snapchat without inspection for its dangerous nature and without the ability to inspect for latent defects within the product.

124.    Snap knew of the potential harm that could result from its defectively designed product features and failed to adequately remedy the product's defects or warn Avi.

125.    Snapchat was defective and unsafe for its intended use due to design, and/or operational defects. When used in a manner that was reasonably foreseeable by Snap, Snapchat failed to perform in a reasonably safe manner that an ordinary customer would expect.

126.    Snap did not include adequate warning to users, which made Snapchat dangerous, hazardous and unsafe for its intended use. The design and/or operational defects in Snapchat cause Snapchat to connect children and young adults to predatory adults; automatically and permanently delete and destroy material evidence; fail in verifying or confirming the age of its users; and affect user behavior patterns resulting in negative effects to their mental health.

127.    Snap failed to warn the public and consumers of the defect or the dangers in the foreseeable use of Snapchat.

19

128.    Snapchat contained a design defect when it left Snap's possession, before being introduced into the stream of commerce by Snap.

Snapchat's inherently dangerous product features are not necessary to consumers who do not use the product for illicit and/or illegal activity. The benefits of changing Snapchat's design to make it safer for use are high, and outweigh the costs.

129.    The risk of danger in the design of Snapchat outweighed any benefits of the design, and safer alternative designs were available at the time of production and distribution. Therefore, Snapchat presented a substantial and unreasonable risk of serious injury to users of Snapchat.

Snap could implement changes to make Snapchat safer for ordinary use without monitoring, editing, moderating, or removing any third-party content from the platform.

130.    As a direct and proximate cause of the Snap's defective product, Snapchat, Avi suffered fatal injuries, all of which are damages recoverable by Plaintiffs in an amount in excess of Fifteen Thousand Dollars ($15,000.00).

131.    As a direct and proximate cause of the Snap's defective product, Snapchat, Plaintiffs have been deprived of the right to a continued relationship and the right to enjoy Avi's continued love, comfort, companionship and society all of which are damages recoverable by Plaintiffs in an amount in excess of Fifteen Thousand Dollars ($15,000.00).

132.    As a direct and proximate result of Snap's defective product, Snapchat, Plaintiffs have experienced grief, sorrow, pain and suffering damages which are damages recoverable by Plaintiffs in an amount in excess of Fifteen Thousand Dollars ($15,000.00).

133.    As a direct and proximate result of Snap's defective product, Snapchat, the Plaintiffs have incurred the expenses of necessary psychological and other care, treatment, and services which are damages recoverable by Plaintiffs in an amount in excess of Fifteen Thousand Dollars ($15,000.00).

134.    Snap's conduct demonstrated a conscious disregard of known accepted procedures, standards and/or protocols, all with the knowledge or utter disregard that such conduct could or would cause serious injury or death to consumers and/or users of Snapchat.

20

135.    As a direct and Proximate result of Snapchat's conduct, Plaintiffs are entitled to punitive damages in an amount in excess of Fifteen Thousand Dollars ($15,000.00).

136.    As the representative of Avianna Cavanaugh's Estate, Diane Esposito Howard seeks damages under NRS 41.085 and Nevada law, which include but are not limited to, medical expenses, funeral expenses, punitive damages and other damages within NRS 41.085, in an amount in excess of Fifteen Thousand Dollars ($15,000.00).

137.    Plaintiffs have been forced to retain the services of an attorney to represent them in this action, and as such are entitled to reasonable attorneys' fees and litigation costs.

## SECOND CAUSE OF ACTION

### Strict Products Liability- Failure to Warn/Inadequate Warning

138.    Plaintiffs repeat and reallege each and every allegation set forth in this Complaint, as though the same were fully set forth herein.

139.    At all times mentioned herein, Snap was engaged in the business of selling, manufacturing, designing, distributing, retailing, and/or wholesaling of technology and social media products, including but not limited to, Snapchat.

140.    At all times mentioned herein, Snap provided Snapchat to consumers with no adequate warnings with regard to the risk of physical and emotional harm, including the risk of the distribution of illegal and counterfeit drugs though Snapchat.

141.    At all times mentioned herein, Snap did not adequately warn users or parents regarding the inclusion of features and policies that foster drug trafficking to young adults, nor of the host of Snapchat users who were actively selling illegal and deadly drugs on Snapchat.

142.    At all times mentioned herein, Snap did not adequately warn users or parents regarding the inclusion of features and policies that foster connections to drug dealers, or that Snapchat was the social media platform of choice for many drug dealers because of its features and policies.

143.    At the time that Avi used Snapchat, there were no adequate warnings that would reasonably catch her attention with regard to the risks of harm described herein.

21

144. At the time that Avi used Snapchat, there were no adequate warnings in a comprehensible language so as to give a fair indication of the risks of Snapchat's use.

145. At the time that Avi used Snapchat, there were no adequate warnings of sufficient intensity justified by the magnitude of the risk of Snapchat's use.

146. Snap knew that consumers would use Snapchat in the same manner as Avi did.

147. As a direct and proximate cause of Snap's failure to warn of the risks of Snapchat's use, Avi suffered fatal injuries which are damages recoverable by Plaintiffs in an amount in excess of Fifteen Thousand Dollars ($15,000.00).

148. As a direct and proximate cause of the conduct of Snap, Plaintiffs are entitled to recover damages for the pain, suffering, anxiety, disability, emotional distress, physical injuries and medical treatment, both past and future, all of which are damages recoverable by Plaintiffs in an amount in excess of Fifteen Thousand Dollars ($15,000.00).

149. As a direct and proximate cause of the cause of the conduct of Snap, Plaintiffs have been deprived of the right to a continued relationship and the right to enjoy Avi's continued love, comfort, companionship and society all of which are damages recoverable by Plaintiffs in an amount in excess of Fifteen Thousand Dollars ($15,000.00).

150. As a direct and proximate result of the conduct of Snap, Plaintiffs have experienced grief, sorrow, pain and suffering damages in an in an amount in excess of Fifteen Thousand Dollars ($15,000.00).

151. As a direct and proximate result of the conduct of Snap, the Plaintiffs have incurred the expenses of necessary psychological and other care, treatment, and services in an amount in excess of Fifteen Thousand Dollars ($15,000.00).

152. Snap's conduct demonstrated a conscious disregard of known accepted procedures, standards and/or protocols, all with the knowledge or utter disregard that such conduct could or would cause serious injury or death to consumers and/or users of Snapchat.

153. As a direct and Proximate result of Snap's conduct, Plaintiffs is entitled to punitive damages in an amount in excess of Fifteen Thousand Dollars ($15,000.00).

22

154.    As the representative of Avianna Cavanaugh's Estate, Diane Esposito Howard seeks damages under NRS 41.085 and Nevada law, which include but are not limited to, medical expenses, funeral expenses, punitive damages and other damages within NRS 41.085, in an amount in excess of Fifteen Thousand Dollars ($15,000.00).

155.    Plaintiffs have been forced to retain the services of an attorney to represent them in this action, and as such are entitled to reasonable attorneys' fees and litigation costs.

### THIRD CAUSE OF ACTION

### Negligent Product Liability/Unreasonably Dangerous Product

156.    Plaintiffs repeat and reallege each and every allegation set forth in this Complaint, as though the same were fully set forth herein.

157.    Snap owed a duty to Avi and to Plaintiffs to exercise reasonable care in the manufacture, design, and/or sale of Snapchat to ensure that Snapchat was safe for their reasonably foreseeable use.

158.    Snap negligently manufactured, designed, assembled, packaged, and/or distributed Snapchat such that it was dangerous and unsafe for its intended use and/or reasonably foreseeable use.

159.    Snapchat failed to perform in a manner reasonably to be expected in light of its nature and intended function and was more dangerous than would be contemplated by the ordinary consumer and/or ordinary user having the ordinary knowledge available in the Las Vegas community.

160.    Snap failed to exercise the amount of care in the design, manufacture, distribution, and/or sale of Snapchat, that a reasonably careful manufacturer, designer, and/or seller would have used in similar circumstances to avoid exposing consumers and/or users to a foreseeable risk of harm.

161.    As a direct and proximate cause of the conduct of Snap, Avi suffered fatal injuries which are damages recoverable by Plaintiffs in an amount in excess of Fifteen Thousand Dollars ($15,000.00).

162. As a direct and proximate cause of the cause of the conduct of Snap, Plaintiffs have been deprived of the right to a continued relationship and the right to enjoy Avi's continued love, comfort, companionship and society all of which are damages recoverable by Plaintiffs in an amount in excess of Fifteen Thousand Dollars ($15,000.00).

163. As a direct and proximate result of the conduct of Snap, Plaintiffs have experienced grief, sorrow, pain and suffering damages in an in an amount in excess of Fifteen Thousand Dollars ($15,000.00).

164. As a direct and proximate result of the conduct of Snap, the Plaintiffs have incurred the expenses of necessary psychological and other care, treatment, and services in an amount in excess of Fifteen Thousand Dollars ($15,000.00).

165. Snap's conduct demonstrated a conscious disregard of known accepted procedures, standards and/or protocols, all with the knowledge or utter disregard that such conduct could or would cause serious injury or death to consumers and/or users of Snapchat.

166. As a direct and Proximate result of Snapchat's conduct, Plaintiffs are entitled to punitive damages in an amount in excess of Fifteen Thousand Dollars ($15,000.00).

167. As the representative of Avianna Cavanaugh's Estate, Diane Esposito Howard seeks damages under NRS 41.085 and Nevada law, which include but are not limited to, medical expenses, funeral expenses, punitive damages and other damages within NRS 41.085, in an amount in excess of Fifteen Thousand Dollars ($15,000.00).

168. Plaintiffs have been forced to retain the services of an attorney to represent them in this action, and as such are entitled to reasonable attorneys' fees and litigation costs.

**FOURTH CAUSE OF ACTION**

**Negligent Distribution and Marketing**

169. Plaintiffs repeat and realleges each and every allegation set forth in this Complaint, as though the same were fully set forth herein.

170. At all times mentioned herein, Snap owed a duty, to Avi and to Plaintiffs, to manufacture, distribute, market and package Snapchat with adequate directions and adequate warnings.

24

171.   As a result of Snap's negligent manufacturing, packaging, and/or distribution, Snap breached its duty, to Avi and to Plaintiffs, by failing to warn Avi and protect her from foreseeable harm, resulting in Avi's fatal injuries and damages as alleged herein.

172.   As a direct and proximate cause of the conduct of Snap, Avi suffered fatal injuries all of which are damages recoverable by Plaintiffs in an amount in excess of Fifteen Thousand Dollars ($15,000.00).

173.   As a direct and proximate cause of the conduct of Snap, Avi suffered fatal injuries which are damages recoverable by Plaintiffs in an amount in excess of Fifteen Thousand Dollars ($15,000.00).

174.   As a direct and proximate cause of the cause of the conduct of Snap, Plaintiffs have been deprived of the right to a continued relationship and the right to enjoy Avi's continued love, comfort, companionship and society all of which are damages recoverable by Plaintiffs in an amount in excess of Fifteen Thousand Dollars ($15,000.00).

175.   As a direct and proximate result of the conduct of Snap, Plaintiffs have experienced grief, sorrow, pain and suffering damages in an in an amount in excess of Fifteen Thousand Dollars ($15,000.00).

176.   As a direct and proximate result of the conduct of Snap, the Plaintiffs have incurred the expenses of necessary psychological and other care, treatment, and services in an amount in excess of Fifteen Thousand Dollars ($15,000.00).

177.   Snap's conduct demonstrated a conscious disregard of known accepted procedures, standards and/or protocols, all with the knowledge or utter disregard that such conduct could or would cause serious injury or death to consumers and/or users of Snapchat.

178.   As a direct and Proximate result of Snapchat's conduct, Plaintiffs are entitled to punitive damages in an amount in excess of Fifteen Thousand Dollars ($15,000.00).

179.   As the representative of Avianna Cavanaugh's Estate, Diane Esposito Howard seeks damages under NRS 41.085 and Nevada law, which include but are not limited to, medical expenses, funeral expenses, punitive damages and other damages within NRS 41.085, in an amount in excess of Fifteen Thousand Dollars ($15,000.00).

25

180.    Plaintiffs have been forced to retain the services of an attorney to represent them in this action, and as such are entitled to reasonable attorneys' fees and litigation costs.

### FIFTH CAUSE OF ACTION

### Negligent Product Liability/Failure to Include an Adequate Warning

181.    Plaintiffs repeat and reallege each and every allegation set forth in this Complaint, as though the same were fully set forth herein.

182.    Snap owed a duty to Avi and to Plaintiffs to exercise reasonable care in the warning of Snapchat's use, and to ensure that Snapchat was safe for its reasonably foreseeable use.

183.    Snap negligently manufactured, designed, packaged, and/or distributed Snapchat such that it contained no adequate warnings of the potential dangers inherent with its use, and as such, was dangerous and unsafe.

184.    Snapchat failed to perform in a manner reasonably to be expected in light of its nature and intended function and was more dangerous than would be contemplated by the ordinary consumer and/or ordinary user having the ordinary knowledge available in the Las Vegas community.

185.    Snap failed to exercise the amount of care in the design, manufacture, and/or packaging of Snapchat that a reasonably careful manufacturer and/or designer would have used in similar circumstances to avoid exposing consumers and/or users to a foreseeable risk of harm.

186.    Avi was a foreseeable user of Snapchat, and used the product in a foreseeable manner.

187.    Snap knew, or should have known, that Snapchat can be dangerous and harmful when used in a reasonably foreseeable manner.

188.    A reasonable company in Snap's position would have warned its users about Snapchat's safety risks.

189.    Snap owed a heightened duty of care to minor and young adult users to provide adequate warnings about the risks of Snapchat because adolescent brains are inherently susceptible to harm from foreseeable use of Snapchat.

26

190.    Snap breached its duty by failing to provide adequate warnings to Avi, as set forth above.

191.    As a direct and proximate cause of Snap's negligence, Avi suffered fatal injuries which are damages recoverable by Plaintiffs in an amount in excess of Fifteen Thousand Dollars ($15,000.00).

192.    As a direct and proximate cause of the cause of Snap's negligence, Plaintiffs have been deprived of the right to a continued relationship and the right to enjoy Avi's continued love, comfort, companionship and society all of which are damages recoverable by Plaintiffs in an amount in excess of Fifteen Thousand Dollars ($15,000.00).

193.    As a direct and proximate result of Snap's negligence, Plaintiffs have experienced grief, sorrow, pain and suffering damages in an in an amount in excess of Fifteen Thousand Dollars ($15,000.00).

194.    As a direct and proximate result Snap's negligence, the Plaintiffs have incurred the expenses of necessary psychological and other care, treatment, and services in an amount in excess of Fifteen Thousand Dollars ($15,000.00).

195.    Snap's conduct demonstrated a conscious disregard of known accepted procedures, standards and/or protocols, all with the knowledge or utter disregard that such conduct could or would cause serious injury or death to consumers and/or users of Snapchat.

196.    As a direct and Proximate result of Snapchat's conduct, Plaintiffs are entitled to punitive damages in an amount in excess of Fifteen Thousand Dollars ($15,000.00).

197.    As the representative of Avianna Cavanaugh's Estate, Diane Esposito Howard seeks damages under NRS 41.085 and Nevada law, which include but are not limited to, medical expenses, funeral expenses, punitive damages and other damages within NRS 41.085, in an amount in excess of Fifteen Thousand Dollars ($15,000.00).

198.    Plaintiffs have been forced to retain the services of an attorney to represent them in this action, and as such are entitled to reasonable attorneys' fees and litigation costs.

. . .

. . .

27

## SIXTH CAUSE OF ACTION

### Breach of the Implied Warranty of Fitness for a Particular Purpose

199. Plaintiffs repeat and reallege each and every allegation set forth in this Complaint, as though the same were fully set forth herein.

200. At all times relevant herein, Snap was engaged in the business of manufacturing, designing, distributing, and/or selling Snapchat.

201. At all times relevant herein, Snap knew that Snapchat was being used by the general public, and Snap impliedly warranted that Snapchat was safe and fit for the purpose for which it was ordinarily used. Avi reasonably relied upon the skill and judgment of Snap as to whether Snapchat was safe and fit for its intended use and purpose.

202. Contrary to such implied warranty, Snapchat was not safe or fit for its intended use or purpose, and was unreasonably dangerous and unfit for use by the general public.

203. As a direct and proximate cause of the conduct of Snap, Avi suffered fatal injuries which are damages recoverable by Plaintiffs in an amount in excess of Fifteen Thousand Dollars ($15,000.00).

204. As a direct and proximate cause of the cause of the conduct of Snap, Plaintiffs have been deprived of the right to a continued relationship and the right to enjoy Avi's continued love, comfort, companionship and society all of which are damages recoverable by Plaintiffs in an amount in excess of Fifteen Thousand Dollars ($15,000.00).

205. As a direct and proximate result of the conduct of Snap, Plaintiffs have experienced grief, sorrow, pain and suffering damages in an in an amount in excess of Fifteen Thousand Dollars ($15,000.00).

206. As a direct and proximate result of the conduct of Snap, the Plaintiffs have incurred the expenses of necessary psychological and other care, treatment, and services in an amount in excess of Fifteen Thousand Dollars ($15,000.00).

207. Snap's conduct demonstrated a conscious disregard of known accepted procedures, standards and/or protocols, all with the knowledge or utter disregard that such conduct could or would cause serious injury or death to consumers and/or users of Snapchat.

28

208.    As a direct and Proximate result of Snapchat's conduct, Plaintiffs are entitled to punitive damages in an amount in excess of Fifteen Thousand Dollars ($15,000.00).

209.    As the representative of Avianna Cavanaugh's Estate, Diane Esposito Howard seeks damages under NRS 41.085 and Nevada law, which include but are not limited to, medical expenses, funeral expenses, punitive damages and other damages within NRS 41.085, in an amount in excess of Fifteen Thousand Dollars ($15,000.00).

210.    Plaintiffs have been forced to retain the services of an attorney to represent them in this action, and as such are entitled to reasonable attorneys' fees and litigation costs.

**SEVENTH CAUSE OF ACTION**

**Negligence**

211.    Plaintiffs repeat and realleges each and every allegation set forth in this Complaint, as though the same were fully set forth herein.

212.    Snap owed a duty to Avi, and to Plaintiffs, to exercise reasonable care in the development, operation, management, promotion, and control of Snapchat, so as not to create an unreasonable risk of harm from Snapchat's use.

213.    Snap owed a duty to protect its customers, including Avi, from reasonably foreseeable criminal acts of third-parties and other dangers known to Snap on its Snapchat platform.

214.    Snap voluntarily assumed a duty to keep minors and young adults safe on its Snapchat platform. Snap has publicly stated that all Snapchat users, including children aged 13 and above, "can expect that [Snap] will take action against any activity that undermines public safety…" and can expect Snap to act against the "selling or facilitating sales or illegal or regulated drugs."

215.    Snap owed a duty to Avi, and to Plaintiffs, to protect Snapchat users from unreasonable risk of injury from the use of Snapchat, including a duty not to facilitate and/or encourage young adult users to engage in reasonably foreseeable dangerous behavior on its platforms.

EGLET ADAMS
EGLET HAM HENRIOD

29

216.    At all times relevant, Snap knew, or should have known, that Snapchat posed an unreasonable risk of harm to children and young adults.

217.    Snapchat knew, or should have known, that Snapchat's users, particularly children and young adults, would not realize the potential risks and dangers of using Snapchat.

218.    Snap failed to exercise the amount of care in the development, operation, management, promotion, and control of Snapchat that a reasonably careful company would have used in similar circumstances to avoid exposing consumers and/or users to a foreseeable risk of harm.

219.    The manner and extent of Avi's use of Snapchat was reasonably foreseeable and/or facilitated and encouraged by Snap.

220.    Snap knew, or should have known, that Snapchat can be dangerous and harmful when used in a reasonably foreseeable manner.

221.    Snap owed a heighted duty of care to minor and young adult users to provide adequate warnings about the risks of Snapchat because adolescent brains are inherently susceptible to harm from foreseeable use of Snapchat.

222.    Snap breached its duties of care through its actions, or failures to act, in the development, operation, management, promotion, and control of Snapchat.
Snap breached it duties by engaging in the acts described in this complaint.

223.    As a direct and proximate cause of Snap's negligence, Avi suffered fatal injuries, all of which are damages recoverable by Plaintiffs in an amount in excess of Fifteen Thousand Dollars ($15,000.00).

224.    As a direct and proximate cause of the cause of Snap's negligence, Plaintiffs have been deprived of the right to a continued relationship and the right to enjoy Avi's continued love, comfort, companionship and society all of which are damages recoverable by Plaintiffs in an amount in excess of Fifteen Thousand Dollars ($15,000.00).

225.    As a direct and proximate result of Snap's negligence, Plaintiffs have experienced grief, sorrow, pain and suffering damages in an in an amount in excess of Fifteen Thousand Dollars ($15,000.00).

226. As a direct and proximate result Snap's negligence, the Plaintiffs have incurred the expenses of necessary psychological and other care, treatment, and services in an amount in excess of Fifteen Thousand Dollars ($15,000.00).

227. Snap's conduct demonstrated a conscious disregard of known accepted procedures, standards and/or protocols, all with the knowledge or utter disregard that such conduct could or would cause serious injury or death to consumers and/or users of Snapchat.

228. Due to the systematic and repetitive nature of Snap's violations, Snap breached its duties in an oppressive, malicious, despicable, gross and wantonly negligent manner. This conduct reveals Snap's conscious disregard for Plaintiffs' rights and thereby entitles Plaintiffs to recover punitive damages.

229. As a direct and Proximate result of Snapchat's conduct, Plaintiffs are entitled to punitive damages in an amount in excess of Fifteen Thousand Dollars ($15,000.00).

230. As the representative of Avianna Cavanaugh's Estate, Diane Esposito Howard seeks damages under NRS 41.085 and Nevada law, which include but are not limited to, medical expenses, funeral expenses, punitive damages and other damages within NRS 41.085, in an amount in excess of Fifteen Thousand Dollars ($15,000.00).

231. Plaintiffs have been forced to retain the services of an attorney to represent her in this action, and as such are entitled to reasonable attorneys' fees and litigation costs.

### EIGHTH CAUSE OF ACTION

#### Misrepresentation

232. Plaintiffs repeat and realleges each and every allegation set forth in this Complaint, as though the same were fully set forth herein.

233. A party who suppresses or omits a material fact which the party is bound in good faith to disclose makes an indirect representation that such fact does not exist. *Nelson v. Heer*, 123 Nev. 217, 163 P.3d 420 (Nev. 2007) (quoting *Midwest Supply, Inc. v. Waters*, 89 Nev. 210, 212-13, 510 P.2d 876, 878 (1973).

31

234. Snap made false and misleading representations and/or omitted material facts regarding the risk to user safety associated with the risks of Snapchat, which it was obligated in good faith to disclose.

235. In public statements, Snap misrepresented and downplayed risks that were known to it regarding Snapchat's use as a forum for selling dangerous and illicit drugs to minors and young adults.

236. Snap knew, or in the exercise of reasonable care should have known, that the misleading representations and/or omissions were false and/or without a sufficient basis for making.

237. Snap intended to induce Avi to act on the false and misleading representations or material omissions.

238. Avi justifiably relied on Snap's false representations.

239. Snap's conduct demonstrated a conscious disregard of known accepted procedures, standards and/or protocols, all with the knowledge or utter disregard that such conduct could or would cause serious injury or death to consumers and/or users of Snapchat.

240. As a direct and Proximate result of Snapchat's conduct, Plaintiffs are entitled to punitive damages in an amount in excess of Fifteen Thousand Dollars ($15,000.00).

241. As the representative of Avianna Cavanaugh's Estate, Diane Esposito Howard seeks damages under NRS 41.085 and Nevada law, which include but are not limited to, medical expenses, funeral expenses, punitive damages and other damages within NRS 41.085, in an amount in excess of Fifteen Thousand Dollars ($15,000.00).

242. Avi, and Plaintiffs, sustained actual and consequential damages, which they are entitled to recover, as a result of their reliance on Snap's false representations or omissions.

## NINTH CAUSE OF ACTION

### Wrongful Death (NRS 41.085)

243. Plaintiffs repeat and realleges each and every allegation set forth in this Complaint, as though the same were fully set forth herein.

32

1      244.   As a direct and proximate case of Snap's conduct, Avianna Cavanaugh suffered

2  fatal injuries and a shortened life expectancy.

3      245.   Diane Esposito Howard is the special administrator and personal representative of

4  the Estate of Avianna Cavanaugh.

5      246.   Therefore, under NRS 41.085, Diane Esposito Howard may maintain an action on

6  behalf of the Estate of Avianna Cavanaugh  for damages against Defendant.

7      247.   As the representative of Avianna Cavanaugh's Estate, Diane Esposito Howard

8  seeks damages under NRS 41.085 and Nevada law, which include but are not limited to, medical

9  expenses, funeral expenses, punitive damages and other damages within NRS 41.085, in an

10  amount in excess of Fifteen Thousand Dollars ($15,000.00).

11  **PRAYER FOR RELIEF**

12      WHEREFORE, Plaintiffs respectfully request that this Court grant Plaintiffs the following

13  relief:

14  1.   General damages in an amount in excess of $15,000.00;

15  2.   Compensatory damages in an amount in excess of $15,000.00;

16  3.   Special damages in an amount in excess of $15,000.00;

17  4.   Damages for grief, sorrow, comfort, pain and suffering, loss of companionship,

18  and loss of society;

19  6.   Medical expenses, funeral expenses and all other damages within NRS 41.085;

20  7.   For punitive damages in an amount to be determined at trial;

21  8.   For pre- and post-judgment interest as provided by law;

22  9.   Costs of suit, reasonable attorney fees, interest incurred herein;

24  . . .

26  . . .

28  . . .

33

10.    For such other and further relief as is just and proper.

Dated this 13ᵗʰ day of March 2024.

                                        **EGLET ADAMS EGLET HAM HENRIOD**


                            By */s/ Robert T. Eglet, Esq.*
                                ROBERT T. EGLET, ESQ.
                                Nevada Bar No. 3402
                                ROBERT M. ADAMS, ESQ.
                                Nevada Bar No. 6551
                                ARTEMUS W. HAM, ESQ.
                                Nevada Bar No. 7001
                                ERICA D. ENTSMINGER, ESQ.
                                Nevada Bar No. 7432
                                CASSANDRA S.M. CUMMINGS, ESQ.
                                Nevada Bar No. 11944
                                400 S. Seventh St., Suite 400
                                Las Vegas, NV 89101
                                Ph: (702) 450-5400; Fax: (702) 450-5451
                                Email: eservice@egletlaw.com
                                *Attorneys for Plaintiffs*

34

1

## DEMAND FOR JURY TRIAL

2        Plaintiffs, by and through her attorneys of record, hereby demands a jury trial of all of the

3  issues in the above matter.

4        DATED this 13th day of March 2024.

5

6                     **EGLET ADAMS EGLET HAM HENRIOD**

7

8              By */s/ Robert T. Eglet, Esq.*
                    ROBERT T. EGLET, ESQ.

9                    Nevada Bar No. 3402
                    ROBERT M. ADAMS, ESQ.

10                 Nevada Bar No. 6551
                 ARTEMUS W. HAM, ESQ.

11                 Nevada Bar No. 7001
                 ERICA D. ENTSMINGER, ESQ.

12                 Nevada Bar No. 7432
                 CASSANDRA S.M. CUMMINGS, ESQ.

13                 Nevada Bar No. 11944
                 400 S. Seventh St., Suite 400

14                 Las Vegas, NV 89101
                 Ph: (702) 450-5400; Fax: (702) 450-5451

15                 Email: eservice@egletlaw.com
                 *Attorneys for Plaintiffs*

16

17

18

19

20

21

22

23

24

25

26

27

28

35